McKeown Bros. Company, Appellee, v. Ogden Kennel Club et al., Defendants.
Appeal of James B. Tuthill, Appellant.

Gen. No. 36,306.

624

Opinion filed March 6, 1933. Rehearing denied March 20, 1933.

David H. Caplow, for appellant; Earle G. Kallen, of counsel.

Sanders, Childs, Bobb & Wescott and Wyatt G. Angelo, for appellee Edward Hines Lumber Co.; Francis L. Harris, of counsel.

McKinney, Lynde & Grear, for appellee McKeown Bros. Co.; George H. Grear, of counsel.

A. S. & E. W. Froehlich, for appellee Charles J. Newburgh; Edwin A. Hofeld, of counsel.

Anderson & Anderson, for appellee C. E. Peterson Co.

Mr. Justice O'Connor delivered the opinion of the court.

In a proceeding brought to foreclose a mechanic's lien a decree was entered finding there was due complainant, McKeown Bros., $9,430.92; to Edward Hines Lumber Company $12,773.83; to C. E. Peterson Co., a corporation, $2,310.92; and to Charles J. Newburgh $220.24. The decree was in the usual form in such cases, and James B. Tuthill, one of the defendants, prosecutes this appeal.

The record discloses that defendant, James B. Tuthill, owned 47 acres located at the intersection of Ogden avenue and Plainfield road, near the town of Lyons in Cook county, part of the land having been used as a stone quarry. March 23, 1927, Tuthill leased 15 59/100 acres of the 47 to the Ogden Kennel Club, a corporation, for a period of three years, with an option to renew for an additional two years. The lease provided that the tenant would not use or permit anyone to use the premises or any building thereon for any use or purpose in violation of the laws of the United States, State of Illinois, or ordinance of the Village of Lyons; that the premises be kept in a clean and wholesome condition and all health and police regulations observed; that the tenant would not use or permit the premises to be used for any purpose "other than athletic exhibitions and sporting events"; that the tenant would pay all costs and expenses of constructing any building or improvements on the premises and keep them free and clear from all mechanics' liens; that before the tenant constructed any building

or improvement it would submit plans and specifications of the proposed building structures or improvements to the landlord; and before any work would be done toward the construction of any building it would deposit in a bank cash in an amount sufficient to pay the cost of construction; the lease further provided how the money deposited should be paid out by the bank; that the buildings and improvements be insured, etc., and that upon the termination of the lease all building structures and improvements would belong to the landlord.

Shortly after the execution of the lease $70,000 was deposited in the bank to insure that the cost of the improvements would be paid. The tenant, the Ogden Kennel Club, proceeded to erect a grandstand, kennels, paddock, judges' stand, track, fences, betting boards, control power, and other structures said to be necessary in holding dog races. And in the erection of these structures arrangements were made for parimutuel betting. The contract for the construction of these structures was let by the Ogden Kennel Club to J. C. O'Brien, and he in turn entered into contracts for labor and material with the lien claimants and others. Complainant, McKeown Bros. Co., was to furnish labor and material for the construction of the grandstand at an agreed price of $36,000; this contract was approved by the Ogden Kennel Club, the tenant; the work was completed and paid for except $5,500. McKeown Bros. Co. also made other contracts direct with the Ogden Kennel Club, one of which was to provide labor and material for a wood floor system, and another to furnish labor and material to complete repairs occasioned by damage done by a tornado; and some other additional work was done. The contract price of these was paid except a balance of $2,290.50.

Hines Lumber Co. furnished the lumber, which it delivered, unloading it on the 15 acres covered by the

lease. Its bill for the lumber was $10,497.59, no part of which has been paid. The lien claimant, Charles J. Newburgh, contracted with O'Brien to furnish glass and glazing material, and delivered the material and did his work under the contract, but has not been paid. Peterson & Co.'s claim was for furnishing and delivering millwork and extra material. It delivered this material and completed its contract, but has not been paid.

It is contended that the decree is wrong and should be reversed because all of the structures built upon the premises "were erected and were to be used for the purpose of conducting a racing track for racing dogs, which racing was to be controlled and conducted for the purpose of gambling and wagering in violation of law"; and that the contract between O'Brien and the Kennel Club is void as contrary to public policy and in violation of law. On the other side it is contended that none of the contracts involved was in violation of any law or contrary to the public policy of the State.

The defendant, in support of his contention, points out that the statute of this State authorizing pari-mutuel betting applies only to horse racing and has no application to dog racing. Cahill's St. ch. 38, ¶ 316. Such has been the construction placed upon the act by another division of this court. *Hawthorne Kennel Club v. Swanson,* 257 Ill. App. 499. That the contracts involved are against public policy and void, defendant cites *Denver Park and Amusement Co. v. Kirchhof,* 89 Colo. 399; *Spurgeon v. McElwain,* 6 Ohio 442; *Mosher v. Griffin,* 51 Ill. 184; and *Mills Novelty Co. v. King,* 174 Ill. App. 559.

The case reported in 89 Colo. 399, was a mechanic's lien case. There the tenant erected a race track, grandstand and other structures on the leased premises and for a time operated a dog racing enterprise. The court said, p. 401: "This business, because of its gambling

features, apparently collided with the criminal law and expired without paying for the improvements." One of the defenses pleaded was that the improvements on the premises were "for the purpose of conducting a racing track for racing dogs . . . and such racing was controlled and conducted . . . for the purpose of gambling and wagering in violation of the laws of Colorado and for gambling and betting on the results of such races in violation of such laws; and that persons were encouraged to enter said premises for the purpose of gambling and betting on the races and the results of the races, . . . bet large sums of money upon the races, with the consent and procurement of" the tenant; and that the parties knew that the work, labor and material furnished were to be used for the purpose of gambling and that the parties engaged in a concerted plan to violate the laws in relation to gambling and betting; that a substantial part of the compensation of the one constructing the buildings and other structures "was to be paid from profits derived from conducting such gambling and betting." A demurrer to this defense was sustained and this was held by the Supreme Court of Colorado to be reversibly erroneous. We think it obvious that that case is not in point. In that case it was admitted by demurring to the answer that the parties had entered into a concerted plan to violate laws against gambling; that they encouraged persons to enter the premises for the purpose of gambling and betting on the dog races with the consent and procurement of the lessee, and that a part of the lien claimants' compensation claimed for work and labor was to be paid from the profits derived from gambling on the races.

In the *Spurgeon* case, *supra* (6 Ohio 442), the statute of Ohio forbade, under penalty, any tavern keeper, etc., from permitting to be kept a nine-pin alley, and it was held that a carpenter erecting such alley could not re-

cover for his work. There is nothing in the statute of this State that we know of that prohibits the construction of any of the structures built on the 15 acres in question.

In the *Mills Novelty* case, *supra* (174 Ill. App. 559), it was held that where slot machines capable of a lawful and of an unlawful use were sold to one known to be a gambler, the seller would be charged with knowledge that the buyer intended to use them for the unlawful purpose of gambling.

In the instant case there is no direct evidence that there was betting on the dog races, nor is there any evidence that the lien claimants entered into any conspiracy with anyone to violate the law; and there is no contention that part of their compensation was to be paid with money derived from the profits of the dog races. McKeown Bros. Co., under their contract, did certain construction work on the premises; Hines Lumber Co. merely delivered lumber; Newburgh furnished glass and labor; Peterson Co. furnished millwork and other material.

The most that can be said to substantiate the defendant's contention is that each of these parties in all probability knew that when all of the structures on the ground were completed dog races would be run, and that there would be bettting on the races which would be illegal. This is entirely insufficient, under the law of this State, to defeat their claims. *Hoefeld v. Ozello,* 290 Ill. 147; *Israel v. Selman,* 263 Ill. App. 351; *Lurton v. Gilliam,* 1 Scam. (2 Ill.) 577; *Frank v. McDonald,* 86 Ill. App. 336; Note 1, 53 A. L. R., p. 1366.

In the *Hoefeld* case, *supra* (290 Ill. 147), in which the principle involved is similar to that we are now considering, a great many of the authorities are discussed. It was there held that where premises in Chicago were leased to be used for a restaurant and saloon, with a clause in the lease giving the tenant the right to

terminate the lease within a certain period of time ''in the event that the State Sunday-closing law is generally enforced,'' was not a provision sanctioning the violation of the Sunday-closing law of this State, and that the tenant could be held for the rent. It was there contended that it was the intention of the parties executing the lease to keep the premises open on Sunday in violation of law. The court said (p. 149): ''There is nothing in the lease that supports this argument. There is no requirement in the lease, expressed or implied, to operate a saloon on Sunday.'' The court there also said that the courts of this State would not aid in the enforcement of a contract entered into with the intention of carrying out anything prohibited by law, and said (pp. 149, 150): ''But the weight of authority, in this country at least, is to the effect that the mere knowledge of the seller that the buyer intends an unlawful use of the goods sold will not void the contract between the parties.''—citing authorities from Arkansas, Alabama and Rhode Island. The court quoted with approval from the Arkansas case (*Ashford v. Mace,* 103 Ark. 114) as follows: '' 'In 9 Cyc. p. 571, it is said: ''In the United States, while some courts have taken the English rule, most of the courts have taken a different view, and have held that the mere knowledge of the seller of goods or services or of the vendor or lessor of property that the buyer intends an illegal use of them is no defense to an action for the price or for rent.'' . . . Although the lessor may have had knowledge that the premises would be used for an immoral purpose, unless, coupled with that knowledge, there was an intention on his part when he executed the lease that the premises should be used for such immoral purpose the lease contract would not be void. . . . The lessor is not the keeper of the conscience of the lessee and has no police control over him in such matters, and mere knowledge on the lessor's part that

the lessee is going to use the premises for an unlawful purpose does not make the lessor a participant in that purpose, for mere knowledge that the lessee may or will use the premises for an unlawful purpose is not, of itself, sufficient to show that the lessor intended that they must or shall be so used.' '' And continuing, the court quoted from the Rhode Island case (*Almy v. Greene*, 13 R. I. 350) as follows: " 'The decision of the court is that knowledge on the part of the lessor, before and at the time of the execution of the lease, that the lessee intended to use the demised premises in violation of the statute was not sufficient to render the lease void, in the absence of any other participation in or furtherance of the illegal purpose by the lessor.' '' And that the mere knowledge on the part of the landlord that the tenant in that case was purchasing liquor for the purpose of selling it in a territory where the sale of such liquor was prohibited by law did not render the lease invalid; that in addition to such knowledge there must be some ''participation'' by the landlord in the illegal purpose; and our Supreme Court there continuing said (p. 151): "In *Lurton v. Gilliam*, 1 Scam. 577, there was an action to recover for cloth sold, based on an election bet. The court said (p. 579): 'It does not appear that the defendants in error were in any way parties to the bet or encouraged it, and we do not perceive that their contract for the sale and delivery of the cloth was tainted with a participation in the original agreement between the parties. Their mere knowledge of it could not certainly connect them with it, and having parted with their property under the arrangement, common honesty surely requires that the party at whose instance it was delivered, conformably to his agreement, should be held answerable for the value of the merchandise delivered.' '' The court there further quoted from *Zeigler v. Illinois Trust and Savings Bank*, 245 Ill. 180,

where it was said: ·"Each argument made by appellees in support of this contention involves a breach of the contract and is not founded on the performance of it." The court further said in the *Hoefeld* case, that the tenant by the terms of the lease contracted to do nothing illegal but that its conduct afterward in carrying on the business in violation of the Sunday-closing law was illegal. The court then discusses further authorities from this State and also from New York and New Hampshire, and held that the lease could not be voided by the tenant on account of the clause above quoted, saying (pp. 153, 154): "As was said by Lord Mansfield in *Holman v. Johnson,* Cowper, 341: 'The objection that a contract is immoral or illegal as between the plaintiff and defendant sounds at all times very ill in the mouth of the defendant.' "

In the *Israel* case, *supra* (263 Ill. App. 351), we had occasion to consider the enforcement of a gambling contract. We there cited and discussed a number of the authorities including *Lurton v. Gilliam* (1 Scam. 577), 53 A. L. R., p. 1366; *Mosher v. Griffin* (51 Ill. 184); *Hoefeld v. Ozello* (290 Ill. 147); and *Frank v. McDonald, supra* (86 Ill. App. 336); and held in effect that unless the party against whom the alleged contract was sought to be enforced not only had knowledge of the illegality of the contract but also participated in it, such contract would not be void. In the instant case, under the facts and the authorities as above stated, we think the contract, so far as it involved the claims for mechanic's lien, is not unenforceable.

A further point is made that the furnishing of labor and material for the erecting of the grandstand and other structures on the premises was not the furnishing of labor and material for which the Mechanics' Liens Act gives a lien; and it is argued that the grandstand, kennels, runway, entrance towers, judges' stands, etc., "are not the sort of structures that come

within the definition of a house or other buildings and are neither permanent nor designed for the habitation of man or animals or the shelter of property.'' Section 1 of the Mechanics' Liens Act, Cahill's St. ch. 82, ¶ 1, provides ''That any person who shall by any contract . . . furnish material, fixtures, apparatus . . . for the purpose of or in the building, altering, repairing or ornamenting any house or other building, walk or sidewalk, . . . driveway, fence or improvement or appurtenances thereto on such lot or tract of land . . . shall have a lien upon the whole of such lot or tract of land.'' We think there is no merit in this contention. All of the materials furnished and the labor performed went toward the improvement of the premises, and by the terms of the lease they could not be removed after the expiration of the term covered by the lease. *Haas Elec. & Mfg. Co. v. Springfield Amusement Park Co.,* 236 Ill. 452.

It is also contended that there is a fatal variance between the pleadings and the evidence, because it is alleged that the improvements were erected on the 47 acres, while the proof showed that they were placed on the 15 acres which was a part of the 47 acres. The lease between the Kennel Club and the defendant, Tuthill, was not recorded and its contents were first brought to the attention of the complainant during the progress of this suit. The decree gives the lien upon the 15 acres. The claimed variance is immaterial.

A further complaint is made that the complainant failed to prove the date of the completion of its work and the date it served its notice for lien. The bill alleged that May 21, 1927, was the date of the completion of the work. Complainant's evidence was in substance that the work on the grandstand was completed May 21, 1927, and the notice of lien is dated July 15, 1927. And a witness testified that July 15 was the proximate date he served the notice on Tuthill. There is no evidence

to the contrary. Under these facts the notice was served within the time provided by Cahill's St. ch. 82, ¶ 24. Moreover, when the notice was offered in evidence several specific grounds of objection were urged against its admission, but it was not objected to on the ground that it had not been served in time. It is the law that specific objection made to the introduction of evidence is a waiver of all other grounds. *First Nat. Bank of Hayward v. Gerry,* 195 Ill. App. 513.

Defendant also contends that complainants, McKeown Bros. Co., Hines Lumber Co., and Newburgh, each failed to prove the value of the material and labor furnished under the contracts with O'Brien, as required by section 21 of the Liens Act, Cahill's St. ch. 82, ¶ 21. That section provides that a subcontractor shall have a lien for the value of the material and labor furnished by him; and it is argued that complainant failed to allege or prove the value of the labor and material furnished; that Hines Lumber Co. alleged that O'Brien agreed to purchase for a certain agreed price a number of feet of lumber, and that there was no evidence of the value of the lumber. And it is also argued that Newburgh likewise failed to make such proof although such failure is not pointed out. The evidence is to the effect that the prices to be paid to these parties by O'Brien were agreed upon. What one pays for anything at a fair sale, there being no suspicious circumstances, is prima facie evidence of its value. *Cloyes v. Plaatje,* 231 Ill. App. 183, and cases therein cited. Defendant offered no evidence that the prices agreed upon were unreasonable, and the contention of defendant is without merit.

A further contention is made that "complainant has failed to allege with sufficient certainty a statement of the contracts made directly with the Ogden Kennel Club, and the dates when made," and that it has failed to prove the terms of the contracts made directly with

the Ogden Kennel Club; the dates when made, when the work was completed, and the furnishing of any labor and material thereunder; and it is argued that complainant claims a lien for labor and material furnished not only under its contract made direct with O'Brien but also under its contract made direct with the Ogden Kennel Club, the tenant; and that section 11 of the Liens Act, Cahill's St. ch. 82, ¶ 11, requires that the bill or petition shall contain a brief statement of the contracts on which the claim is founded, the dates when made and when completed, and also set forth the amount due; and that the allegation of the bill in the instant case is that the contracts were entered into between April 24 and June 9, 1927, and that this is not a sufficient compliance with section 11. The bill alleges the making of the contracts as above stated, and then follows a list of 21 items describing the particular improvements and the amount therefor set opposite; and further, that complainant completed the work and delivered the materials on June 9, 1927. We think the allegations are sufficient.

The argument of defendant, in support of its further contention, is that as to 19 of the items set up in the bill there is no competent testimony as to who ordered the work, when it was ordered, nor the price agreed to be charged; that the witness Kennecott testified concerning the job tickets, how they were made up and then written in a notebook, etc., and that this evidence is insufficient. The total amount claimed for the work done under the direct contracts with the Kennel Club, less payments made, was $2,290.50; the agreed contract price of two contracts totaled $5,285. There is other evidence as to the price agreed upon between the parties. There was no evidence to the contrary. Moreover, the evidence showed that the Kennel Club paid the complainant, on account of the work it did under its contract, more than $5,000. There is

other evidence in the record but we think it unnecessary to discuss it further. There was no serious error committed by the master in permitting legal questions to be put to O'Brien—certainly none that would warrant us in disturbing the decree.

A further contention is made that the complainant failed to serve a notice of lien as required by section 24 of the Liens Act, Cahill's St. ch. 82, ¶ 24, in that the notice failed to state with whom the contractor had his contract. The notice was in the form provided by statute. By it the defendant, Tuthill, was notified that the complainant had been employed by O'Brien to furnish labor and material and to construct a grandstand and other improvements on the property and that there was due and would become due, under the contract, $7,790.50. Tuthill had entered into the lease with the Ogden Kennel Club which provided in detail for the improvements to be put on the property. It is obvious that the contention made is entirely frivolous.

It is further said the evidence fails to show that the Ogden Kennel Club was served with the notice, that this is required under the law and that the notice to Tuthill was insufficient. The statute requires that notice be served on the owner or his agent or architect or the superintendent having charge of the building or improvements. (Section 24 of the Liens Act, Cahill's St. ch. 82, ¶ 24.) Here Tuthill was the owner of the property, and we think the notice to him was sufficient under the statute. The Kennel Club had no interest in the property because its lease had been terminated by forcible detainer proceedings about four months after the lease was made.

Contention is made by defendant that the contract provided that before payment could properly be made there should be produced a certificate of the architect, and that there was no allegation or proof of the issuance of the certificate. Complainant alleged the

making of its contract with O'Brien; that it had complied with the terms and conditions of that contract, and that the work had been accepted by O'Brien and the Kennel Club. This allegation we think sufficient. Moreover, there is a certificate offered by complainant certifying that complainant is entitled to $5,500 from the Kennel Club under the terms of its contract; this purports to be signed by the architects. There is further evidence in the record as to this certificate which we think it unnecessary to refer to. In the absence of any evidence to the contrary, we think this is sufficient, and the contention cannot be sustained.

Defendant finally contends that Peterson Co., one of the lien claimants, failed to prove the date of the service of its notice of lien and the date of the last delivery of material; that it furnished material for use on the premises occupied by the Kennel Club and that it has failed to serve a notice of lien as required by section 24 of the Liens Act, Cahill's St. ch. 82, ¶ 24. A witness testified that he served the notice on defendant Tuthill July 15, 1927; that before that he tried to serve the Kennel Club but could find no representative of it. We think this was sufficient. A witness further testified, "We furnished everything as per contract"; that he saw the materials after they were delivered on the premises; that the delivery was made May 19. We think this was a sufficient compliance with the statute and there was no evidence to the contrary.

The decree of the superior court of Cook county is affirmed.

*Affirmed.*

McSurely, P. J., and Matchett, J., concur.